UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| NADIA RAMOS; RICARDO RACINES; and NATIVIDAD MARTINEZ<br><br>　　　　Plaintiffs,<br><br>v.<br><br>JETBLUE AIRWAY CORPORATION; AIRBUS AMERICAS, INC.; THALES AVIONICS, INC.; and AIRBUS SAS<br><br>　　　　Defendants. | Civil Action No.: _____<br><br>COMPLAINT & JURY TRIAL DEMAND |

## COMPLAINT & JURY DEMAND

Plaintiffs, NADIA RAMOS, RICARDO RACINES, and NATIVIDAD MARTINEZ (hereinafter referred to as "Plaintiffs"), sue Defendants JETBLUE AIRWAY CORPORATION, AIRBUS AMERICAS, INC., THALES AVIONICS, INC., AIRBUS SAS and alleges:

### JURISDICTION, PARTIES, AND VENUE

1. At all times relevant to the events described herein, Plaintiff Nadia Ramos was a resident of Nutley, Essex County, New Jersey.

2. At all times relevant to the events described herein, Plaintiff Ricardo Racines was a resident of Nutley, Essex County, New Jersey.

1

3. At all times relevant to the events described herein, Plaintiff Natividad Martinez was a resident of Nutley, Essex County, New Jersey.

4. Upon information and belief, Defendant JetBlue Airways Corporation (hereinafter "JetBlue") is a foreign for-profit corporation, registered to conduct business in the State of Florida, with a principal address of 27-01 Queens Plaza North, Long Island City, NY 11101.

5. Defendant JetBlue is actively registered in, and has systematic and continuous contact with, the State of Florida.

6. Defendant JetBlue can be served by and through its registered agent, Corporation Service Company, located at 1201 Hays Street, Tallahassee, Florida 32301-2525.

7. Upon information and belief, Defendant Airbus Americas, Inc. (hereinafter "Airbus") is a foreign for-profit corporation, registered to conduct business in the State of Florida, with a principal address of 5201 Blue Lagoon Dr., Miami, Florida 33126.

8. Defendant Airbus Americas, Inc. is actively registered in, and has systematic and continuous contact with, the State of Florida.

9. Defendant Airbus Americas, Inc. can be served by and through its registered agent, CT Corporation System, located at 1200 South Pine Island Road, Plantation, Florida 33324.

10. Upon information and belief, Defendant Thales Aviation, Inc. (hereinafter "Thales") is a foreign for-profit corporation, registered to conduct business in the State of Florida, with a principal address of 5201 Blue Lagoon Dr., Miami, Florida 33126.

11. Defendant Thales Avionics, Inc. is actively registered in, and has systematic and continuous contact with, the State of Florida.

12. Defendant Thales Avionics, Inc. can be served by and through its registered agent, Corporation service Company, 1201 Hays Street, Tallahassee, Florida 32301.

13. Upon information and belief, Defendant Airbus SAS (hereinafter "Airbus SAS") is a foreign for-profit corporation, with an address of 2, rond-point Emile Dewoitine, 31700 Blagnac, France.

14. Defendant Airbus SAS has systematic and continuous contact with the State of Florida by and through its American based subordinate company, Defendant Airbus.

15. Defendant Airbus SAS can be served by and through Chapter 1, Article 3 of the Hauge Service Convention at its principal location of 2, rond-point Emile Dewoitine, 31700 Blagnac, France.

16. The subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. Sec. 1331, insofar as a federal question is presented pursuant to the Convention for the Unification of Certain Rules for International

Carriage by Air signed in Montreal on May 28, 1999 (hereinafter known as the "Montreal Convention").

17. This Court has proper jurisdiction over the claims asserted by the Plaintiffs herein, as the Defendants have sufficient contacts with the State of Florida so as to render themselves corporate residents of the State of Florida and the incident giving rise to the counts herein occurred at or near the Tampa International Airport located at 4100 George J. Bean Pkwy, Tampa, Florida 33607.

18. Venue is proper in this Court pursuant to the Montreal Convention and because the incident giving rise to the counts herein occurred at or near the Tampa International Airport located at 4100 George J. Bean Pkwy, Tampa, Florida 33607.

## **FACTS COMMON TO ALL COUNTS**

19. Plaintiffs adopt and incorporate by reference paragraphs 1 through 18 of the Complaint as if fully set forth herein.

20. At all times herein, Defendant JetBlue owned and operated an Airbus A320-232 aircraft, with a serial number of 2368, and a Federal Aviation Administration ("FAA") registration number of N605JB, which was operated as JetBlue Flight 1230, and is hereinafter referred to as (the "Aircraft").

21. The Aircraft was designed, manufactured, and produced by Defendants Airbus and Airbus SAS, who, at all times material hereto, provided continuous and on-going product support, guidance, policies, and operating procedures to Defendants JetBlue and Thales.

22. At all times material hereto, the Aircraft was equipped with an Elevator Aileron Computer (hereinafter "ELAC"), which was designed, manufactured, and produced, by Defendant Thales who, at all times material hereto, provided continuous and on-going product support, guidance, policies, and operating procedures to Defendants JetBlue, Airbus, and Airbus SAS.

23. Upon information and believe, at all times material hereto, the software for the Aircraft's ELAC system which was designed, manufactured, and produced, by Defendant Airbus and Airbus SAS who, at all times material hereto, provided continuous and on-going product support, guidance, policies, and operating procedures to Defendants JetBlue and Thales.

24. On October 30, 2025, at approximately 1650 GMT, the Aircraft departed Cancún International Airport ("CUN") with a proposed destination of Newark-Liberty International Airport ("EWR").

25. After departing CUN, the Aircraft climbed to a cruise altitude of 35,000 feet mean sea level ("MSL").

26. Approximately an hour into flight, at around 1758 GMT, and while being controlled by the autopilot system, the Aircraft suddenly and unexpectedly pitched nose down resulting in a sudden and un-commanded loss of altitude.

27. After experiencing the unexpected loss of altitude, the Aircraft's flight crew reported to Air Traffic Control ("ATC"), "we have a flight control issue and at least 3 people injured."

28. After experiencing the unexpected loss of altitude, the Aircraft's flight crew made a command decision to deviate to the Tampa International Airport ("TPA").

29. At all times relevant hereto, the Aircraft never returned to the previous cruise altitude of 35,000 feet MSL, and, instead, maintained a descent until finally landing at TPA.

30. Upon landing and taxiing to the gate, the Aircraft was met by medical professionals.

31. On November 28, 2025, Defendant Airbus SAS issued precautionary notice to all operators of its A320 aircraft that intense solar radiation may corrupt data critical to the functioning of flight. The notice further explained how Defendant Airbus SAS would issue an Emergency Airworthiness Directive by and through the European Union Aviation

Safety Agency (EASA). *See* **EXHIBIT 1: Airbus Update on Precautionary Fleet Action.**

32. On November 28, 2025, EASA issued an Emergency Airworthiness Directive in which it described how "[a]n Airbus A320 aeroplane recently experienced an uncommanded and limited pitch down event. The autopilot remained engaged throughout the event, with a brief and limited loss of altitude, and the rest of the flight was uneventful. Preliminary technical assessment done by Airbus identified a malfunction of the affected ELAC as possible contributing factor." *See* **EXHIBIT 2: EASA AD No.: 2025-0268-E.**

33. Solar radiation was not listed as a cause of the uncommanded pitch down event in the EASA Emergency Airworthiness Directive.

34. The Bureau d'Enquetes et d'Analyses preliminary report does not list a solar radiation event as the cause of the uncontrolled pitch down event, instead illustrating that the event occurred during an ELAC switchover.

35. As a result of the unexpected pitch down, Plaintiffs suffered significant injury as further detailed herein.

36. Plaintiffs' injuries resulted, and will further result, in medical and related expenses in the past and the future as set forth below.

## COUNT I: MONTREAL CONVENTION NEGLIGENCE
### (*Defendant JetBlue*)

37. Plaintiffs adopt and incorporate by reference paragraphs 1 through 36 of the Complaint as if fully set forth herein.

38. At all times relevant hereto, Defendant JetBlue is a commercial airline, and thus a common carrier engaged in the business of transporting passengers for hire by air.

39. On October 30, 2025, Defendant JetBlue operated and controlled the Aircraft designated as JetBlue flight 1230 from CUN to EWR, which the Plaintiffs were ticketed to travel. Defendant JetBlue issued the ticket for travel to the Plaintiffs.

40. The Plaintiffs were revenue-paying passengers who were lawfully aboard the Aircraft.

41. At all times material hereto, Defendant JetBlue employed maintenance and flight crews responsible for the safe and secure maintenance and operation of the flight, as well as the safety of passengers.

42. Defendant JetBlue, their agents, servants, representatives, employees, and/or contractors were responsible for the training, management, supervision, maintenance, and/or control of its maintenance and flight crews that maintained, dispatched, and operated the Aircraft, including,

but not limited to, the adherence to standard safety policies, protocols, and regulations.

43. As a common carrier of passengers for hire, Defendant JetBlue has a duty to provide a safe flight, with a safe aircraft.

44. Upon information and belief Defendants JetBlue was aware of a fleet-wide reoccurring autopilot glitch during an ELAC switchover, which caused an un-commanded and sudden pitch change.

45. Despite the knowledge of the critically dangerous, fleet wide, ELAC-related condition, Defendant JetBlue permitted the Aircraft to perform commercial operations for hire, which resulted in the incident material to the claims herein, and the Plaintiffs' resulting injuries and harms.

46. As alleged herein, Defendant JetBlue breached its duty of care to the Plaintiffs by and through their failure to reasonably operate, maintain, manage, control, equip, handle, and/or pilot the aircraft and/or adequately and appropriately train the pilots and crew to operate a passenger aircraft to industry standards. Defendant's breaches of duty were the direct and proximate cause of the Plaintiffs' physical and mental injuries.

47. As a direct and proximate result of the negligence and fault of Defendant, Plaintiffs have been made to sustain and suffer injuries and damages,

including but not limited to conscious pain, suffering, mental anguish, disability, loss of income, medical expenses and other damages.

48. Defendant JetBlue cannot meet its burden of proving that its negligence did not cause or contribute to the incident material hereto and the resulting injuries suffered by the Plaintiffs.

49. Defendant JetBlue cannot meet its burden of proving that the injuries suffered by the Plaintiffs were caused solely by the acts of third parties.

50. Pursuant to the Montreal Convention governing international air travel and pleaded in the alternative and without prejudice to anything set forth herein to the contrary, Defendant JetBlue is responsible for the actions of its agents and contractors, and thus the actions of said third parties are not a defense to the liability of JetBlue.

### COUNT II: MONTREAL CONVENTION STRICT LIABILITY
*(Defendant JetBlue)*

51. Plaintiffs adopt and incorporate by reference paragraphs 1 through 50 of the Complaint as if fully set forth herein.

52. All times material hereto, Defendant JetBlue was a common carrier engaged in the business of providing air transportation to revenue-paying passengers on an international flight.

10

53. Under Articles 17 and 21(a) of the Montreal Convention, Defendant is strictly liable to each Plaintiff for provable damages of up to 151,880 SDRs (which equates to approximately $201,896.00 U.S. Dollars).

54. Additionally, pursuant to Article 21(2) of the Montreal Convention, due to the negligence, carelessness, gross negligence, and/or recklessness hereinabove set for forth and the injuries and damages attendant thereto, Plaintiffs seek damages in excess of 151,880 SDRs, according to proof at the time of trial, as alleged herein.

## COUNT III: NEGLIGENCE
### *(Defendant JetBlue, Defendant Airbus, Defendant Airbus SAS, and Defendant Thales )*

55. Plaintiffs adopt and incorporate by reference paragraphs 1 through 54 of the Complaint as if fully set forth herein.

56. At all times pertinent hereto, Defendants JetBlue, Airbus, Airbus SAS, and Thales owed a duty of reasonable care in the design, manufacturing, support, inspection, maintenance, and repair of the Aircraft and its systems, including, but not limited to the ELAC system.

57. The event material hereto and resulting injuries and damages suffered by the Plaintiffs were the direct result of the negligence and fault of Defendants Airbus, Airbus SAS, JetBlue, and Thales which includes, but is not limited to, the following:

11

    a.    Negligent failure to inspect and identify errors in the Aircraft's ELAC system and software;

    b.    Negligent failure to repair or correct the errors known to be in the Aircraft's ELAC system and software;

    c.    Negligent failure to test the Aircraft's ELAC system and software;

    d.    Negligent failure to properly design the Aircraft's ELAC system and software;

    e.    Negligent failure to properly manufacture the Aircraft's ELAC system and software;

    f.    Negligent failure to properly support the Aircraft's ELAC system and software; and

    g.    Such other and further acts of negligence as may be shown in the trial of this cause as discovery progresses.

58. No act or omission on the part of the Plaintiffs caused or contributed to the event material hereto.

59. As a direct and proximate result of the negligence and fault of Defendants, Plaintiffs have been made to sustain and suffer injuries and damages, including but not limited to conscious pain, suffering, mental anguish, disability, loss of income, medical expenses and other damages.

60. The Plaintiffs are entitled to a judgment against these Defendants in an amount in excess of $75,000.00 U.S. Dollars.

## COUNT IV: STRICT PRODUCTS LIABILITY
*(Defendant Airbus, Airbus SAS, Thales)*

61. Plaintiffs adopt and incorporate by reference paragraphs 1 through 60 of the Complaint as if fully set forth herein.

62. Plaintiffs are in the class of persons that Defendants Airbus, Airbus SAS, and Thales should reasonably foresee as being subject to the harm caused by defectively designing the Aircraft, inclusive of its components and software, including, but limited to, the ELAC system, insofar as Plaintiffs were the type of people for whom the Autopilot was intended to be used.

63. Defendant Airbus, Airbus SAS, and Thales are engaged in the business of manufacturing, assembling, producing, marketing, supporting, type certificating, authorizing, and designing the Aircraft, inclusive of its components and software, including, but not limited to, the ELAC system, and these Defendants placed them into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the products.

64. The Aircraft, inclusive of its components and software, which include, but are not limited to, the ELAC system, was defective in design and formulation, and were unreasonably dangerous when it left the hands of

Defendants Airbus, Airbus SAS, and Thales, the manufacturers, assemblers, producers, marketers, designers, and supporters, and it reached the user of the product, the Plaintiffs, without substantial alteration from the condition in which it was sold.

65. The Aircraft, inclusive of its components and software, including, but not limited to, the ELAC system, manufactured, assembled, produced, marketed, designed, and supported, by Defendants Airbus, Airbus SAS, and Thales was unreasonably and dangerously defective beyond the extent contemplated by ordinary operators and passengers.

66. The design and/or manufacturing defects that existed in the ELAC system inclusive of its components and software, used in the Aircraft were defective in design in the following particulars:

  a. Defectively designed and/or manufactured the ELAC system;

  b. Defectively designed and/or manufactured the ELAC software;

  c. Defectively designed and/or manufactured the ELAC system with respect to its physical and software integration with the Aircraft's autopilot system;

  d. Defectively designed and/or manufactured the ELAC system with respect to its transition from one ELAC computer to the second ELAC computer;

  e. Defectively designed and/or manufactured the ELAC system such that it induced and un-commanded pitch-hardover, run away movement of the elevator servos, or otherwise cause the uncontrollability with the appropriate safety features to prevent such occurrences; and

  f. Defectively designed and/or manufactured the ELAC system such that it was equipped with components susceptible to malfunction, sudden release, un-commanded behavior, short circuiting, all inducing pitch hardover; and

  g. Defectively designed and/or manufactured the ELAC system such that it was equipped with defective circuit boards, circuit board fasteners, circuit board components such as resistors, diodes, and relays, which will induce a pitch hardover and/or runaway.

67. Defendants Airbus, Airbus SAS, and Thales failed to adequately study and/or test the ELAC system, inclusive of its components and software, in addition to their failure to adequately report the results of any studies and/or tests that may have been performed.

68. Defendants Airbus, Airbus SAS, and Thales knew or should have known of the risk of injury from the faulty ELAC system, inclusive of its components and software, yet they failed to provide adequate warning to the ownership and/or pilot community, and they continued to promote

the ELAC system, inclusive of its components and software, which include, as being safe and effective.

69. Defendants Airbus, Airbus SAS, and Thales are responsible for formulating and distributing appropriate operating limitations, maintenance instructions, and instructions for continued airworthiness for the ELAC system, inclusive of its components and software, to ensure that they are and remain safe for flight.

70. The product defects alleged above were a substantial contributing cause of the injuries and damages suffered by Plaintiffs.

71. As a direct and proximate result of the dangerous and defective ELAC, inclusive of its components and software, that was manufactured, assembled, produced and marketed by Defendants Airbus, Airbus SAS, and Thales, and specifically their failure to warn and their negligence, carelessness, and other wrongdoings and actions described herein, Plaintiffs have been made to sustain and suffer injuries and damages, including but not limited to conscious pain, suffering, mental anguish, disability, loss of income, medical expenses and other damages, all of which are in an amount in excess of $75,000.00 exclusive of interest and costs.

## COUNT V: STRICT PRODUCTS LIABILITY: FAILURE TO WARN
### *(Defendant Airbus)*

72. Plaintiffs adopt and incorporate by reference paragraphs 1 through 71 of the Complaint as if fully set forth herein.

73. Defendants Airbus, Airbus SAS, and Thales manufactured, assembled, produced, marketed, supported, and designed the ELAC, inclusive of its components and software, and placed it into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the products.

74. Defendant Airbus manufactured, assembled, produced, marketed, supported, and designed the ELAC system, inclusive of its components and software, was defective due to inadequate warning, studying, and/or testing, and inadequate reporting regarding the results of such studies and/or tests.

75. The ELAC system, inclusive of its components and software, was defective due to inadequate warning by and through the maintenance manual, the Airplane Flight Manual, Pilot's Operating Handbook, associated appendices, associated supplements, aircraft checklists and other publications, including the absence of the same. Defendant Airbus failed to provide any warning regarding system failure including, but not

17

limited to, a warning which would properly notify passengers, such as the Plaintiffs, that a failure of the ELAC system, inclusive of its components and software, would result in an un-commanded, and drastic, pitch input. Defendants Airbus, Airbus SAS, and Thales knew or should have known of the risk of injury from the ELAC system, yet it failed to provide adequate warning and continued to promote the system as being safe and effective.

76. The defective warnings, and the failure to provide warnings of any kind, pertaining to the ELAC system, inclusive of its components and software, were substantial factors in bringing about the injuries to the Plaintiffs.

77. Defendants Airbus, Airbus SAS, and Thales are responsible for formulating and distributing appropriate operating limitations, maintenance instructions, and instructions for continued airworthiness for the ELAC system, inclusive of its components and software, to ensure that they are and remain safe for flight.

78. As a direct and proximate result of the dangerous and defective ELAC, inclusive of its components and software, that was manufactured, assembled, produced and marketed by Defendants Airbus, Airbus SAS, and Thales, and specifically their failure to warn and their negligence, carelessness, and other wrongdoings and actions described herein,

Plaintiffs have been made to sustain and suffer injuries and damages, including but not limited to conscious pain, suffering, mental anguish, disability, loss of income, medical expenses and other damages, all of which are in an amount in excess of $75,000.00 exclusive of interest and costs.

## DAMAGES

79. Plaintiffs reallege and incorporate by reference paragraphs 1 through 78 as if fully set forth herein.

80. No act, omission, or commission on part of the Plaintiffs caused or contributed to the subject incident, or any of the damages being alleged and claimed by Plaintiffs herein.

81. As a direct and proximate result of the negligence and fault of the Defendants, Plaintiffs have been made to sustain and suffer injuries and damages, including but not limited to:

   a. conscious pain;

   b. suffering;

   c. mental anguish;

   d. impairment;

   e. loss of income;

   f. medical expenses; and

   g. other damages.

WHEREFORE, Plaintiffs demand a trial by jury and prays that judgment be entered in favor of Plaintiffs and against Defendants in an amount in excess of $75,000.00, along with the costs of this action, interest, attorney fees, and such other relief as this Court deems just and equitable.

DATED this 8th day of January, 2026.

**COFFEY MCPHARLIN TRIAL LAW**
*Attorneys for Plaintiff – Pro Hac Pending*
550 S. Andrews Avenue, Suite 600
Fort Lauderdale, Florida 33301
(954) 914-7403 – Direct
(954) 541-3194 – Main
(954) 947-8750 – Fax
pleadings@coffeymcpharlin.com

By: /s/ Sam Coffey
SAM COFFEY, ESQ.
Florida Bar No.: 71838

**RAMOS LAW**
*Attorneys for the Plaintiffs – Pro Hac Pending*
10190 Bannock Street Suite #200
Northglenn, CO 80260
Telephone: 303-529-7972
Fax: 303-865-5666
jlorusso@ramoslaw.com
zdenison@ramoslaw.com

*/s/ Joseph P. LoRusso*
Joseph LoRusso – *Pro Hac Pending*
Ezekiel Denison – *Pro Hac Pending*
Jessica McBryant – *Pro Hac Pending*